RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0134p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

YOSAUN SMITH, individually and as a representative of a class of similarly situated persons and on behalf of Catholic Health Initiatives 401(k) Plan,

*Plaintiff-Appellant,*

*v.*

COMMONSPIRIT HEALTH a/k/a Catholic Health Initiatives; CATHOLIC HEALTH INITIATIVES RETIREMENT PLANS SUBCOMMITTEE; DOES 1–10,

*Defendants-Appellees.*

> No. 21-5964

---

Appeal from the United States District Court for the Eastern District of Kentucky at Covington.
No. 2:20-cv-00095—David L. Bunning, District Judge.

Argued: June 8, 2022

Decided and Filed: June 21, 2022

Before: SUTTON, Chief Judge; KETHLEDGE and MURPHY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Alec J. Berin, MILLER SHAH LLP, Philadelphia, Pennsylvania, for Appellant. Lars C. Golumbic, GROOM LAW GROUP, CHARTERED, Washington, D.C., for Appellees. **ON BRIEF:** Alec J. Berin, James C. Shah, Kolin C. Tang, MILLER SHAH LLP, Philadelphia, Pennsylvania, James E. Miller, MILLER SHAH LLP, Chester, Connecticut, Mark K. Gyandoh, CAPOZZI ADLER, P.C., Merion Station, Pennsylvania, Jeffrey S. Goldenberg, GOLDENBERG SCHNEIDER, LPA, Cincinnati, Ohio, for Appellant. Lars C. Golumbic, Sean C. Abouchedid, Meredith F. Kimelblatt, Nathaniel W. Ingraham, GROOM LAW GROUP, CHARTERED, Washington, D.C., Jennifer Orr Mitchell, DINSMORE & SHOHL LLP, Cincinnati, Ohio, for Appellees. Elizabeth L. McKeen, O'MELVENY & MYERS LLP, Newport Beach, California, Brian D. Boyle, Deanna M. Rice, O'MELVENY & MYERS LLP, Washington, D.C., Jaime A. Santos, GOODWIN PROCTER LLP, Washington, D.C., for Amici Curiae.

---

**OPINION**

---

SUTTON, Chief Judge.   Yosaun Smith claims that her retirement plan should have offered a different mix of fund options, in particular that it should have replaced actively managed mutual funds with passively managed mutual funds.  But the Employee Retirement Income Security Act, ERISA for short, does not give the federal courts a broad license to second-guess the investment decisions of retirement plans.  It instead supplies a cause of action only when retirement plan administrators breach a fiduciary duty by, say, offering imprudent investment options.  Because Smith has not alleged facts from which a jury could plausibly infer that CommonSpirit breached any such duty and because Smith's other claims do not get off the ground, we affirm the district court's dismissal of her complaint.

I.

A.

Retirement plans have changed over the years.  When Congress enacted ERISA in 1974, 29 U.S.C. § 1001 *et seq.*, a defined-benefit plan was the order of the day.  Such plans generally provide benefits based on the years of service and salary levels of employees and guarantee a fixed periodic payment from retirement to death.  So long as the beneficiaries receive their regular distribution checks under these plans, they tend not to worry about the investment decisions made by the plan administrators even if the company—which carries the pension obligation—attends to those decisions assiduously.  *See Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020).

More common today are defined-contribution plans, the most familiar being 401(k) plans.  They allow participants to direct pre-tax income to a tax-advantaged account.  26 U.S.C. § 402(g).  Employers often match employee contributions to the account with contributions of their own.  *Id.* § 404(a).  The ultimate value, and potential payout, of a defined-contribution plan is tied to the value of the assets in the account during the employee's retirement—and any dividends and interest generated by those assets.  *Thole*, 140 S. Ct. at 1618.  A beneficiary's

payout thus may "turn on the plan fiduciaries' particular investment decisions." *Id.* Under ERISA, participants in defined-contribution plans may bring a breach of fiduciary duty claim arising from imprudent investment options supplied by the plan. 29 U.S.C. § 1132.

Just as the kinds of retirement plans available to employees have changed over the last few decades, so have the investment options available to them. In the past, most investment options, whether for defined-benefit or defined-contribution plans, turned on active management, in which "the portfolio manager actively makes investment decisions and initiates buying and selling of securities in an effort to maximize return." John Downes & Jordan Elliot Goodman, *Barron's Dictionary of Finance and Investment Terms* 9 (6th ed. 2003). Investors today have the option of using index funds, which create "a fixed portfolio structured to match the overall market or a preselected part of it," which require little to no judgment, and which have grown in popularity as an alternative to active management. *Id.*; *see* Burton G. Malkiel, *A Random Walk Down Wall Street* 359 (9th ed. 2007). Little surprise, actively managed funds, which require considerable judgment and expertise, charge more than passively managed funds, which require little judgment and expertise. Charles D. Ellis, *Winning the Loser's Game* 7, 28 (4th ed. 2002). In the past thirty years, some financial experts have questioned how much value active management adds. In a world in which roughly half the actively managed mutual funds beat their benchmark—say the S&P 500—and in which one can buy passive funds that mirror the same benchmark at far less cost, some experts have questioned the cost-benefit tradeoffs of active management. *See id.* at 28–31; Sam Mamudi, *Active vs. Passive: The Debate Heats Up*, Wall St. J., Aug. 24, 2009. The attractiveness of active funds varies based on the goals of the funds, the markets on which they concentrate, the risk tolerance of the investor, the strategy of the investment manager—and the suitability of any one fund for any one pensioner, a complex inquiry that has the capacity to vary as much as human DNA from one individual to another. *See* Hsui-Lang Chen et al., *The Value of Active Mutual Fund Management: An Examination of the Stockholdings and Trades of Fund Managers*, 35 J. Fin. & Quantitative Analysis 343, 343–68 (2000).

One feature of the active/passive management debate deserves focus. It is easy for investors at a given time to preoccupy themselves with the present-day or year-to-year value of

their portfolio—the part of a financial statement usually placed most squarely in view. But just as compounding can dramatically increase the value of a mutual-fund investment over time, so the costs of that investment can dramatically eat into that investment over time. Fixed management fees imposed annually on the value of a fund, ranging from 10 to 100 basis points (or .1% to 1%), can erode or at least undercut growth. In one year, a one percent management fee would reduce a 5% increase in a fund to 4%, and it would increase a 5% loss in a fund to 6%. For example, $100,000 invested at a 5% growth rate would generate $265,330 in 20 years, but with a 1% management fee it becomes $219,112, 83% of what it would have been without the fees. Over time, management fees, like taxes, are not trivial features of investment performance.

B.

Yosaun Smith once worked for Catholic Health Initiatives, now known as CommonSpirit Health, one of the largest healthcare providers in the United States. Starting in 2016, she participated in CommonSpirit's defined-contribution 401(k) plan. CommonSpirit appointed an administrative committee to administer the plan. The plan serves more than 105,000 people and manages more than $3 billion in assets. It offers 28 different funds in which employees may invest their contributions. These include several index funds with management fees as low as 0.02% and several actively managed funds with management fees as high as 0.82%. The actively managed Fidelity Freedom Funds are the default investment if employees do not choose to place their contributions in a different fund instead. The Freedom Funds are a suite of "target date fund[s]," which means that the managers change the allocation of the underlying investments that they hold over time, say by selling funds that hold stocks to buy a greater proportion of funds that hold bonds or cash. R.1 at 7. Sometimes called a fund's "glide path," this reallocation of asset types allows managers to protect an employee's investment gains and spare her the unpredictability of market fluctuations as she approaches retirement. Other target date funds, such as the Fidelity Freedom Index Funds, include only index investments in their glide path and as a result have lower costs.

Smith sued CommonSpirit and the plan's administrative committee under ERISA's remedial provision for breach of fiduciary duty. 29 U.S.C. § 1132(a)(2). She seeks to represent a proposed class of similarly situated participants in the plan. She claims that CommonSpirit

breached its duty of prudence by offering several actively managed investment funds when index funds available on the market offered higher returns and lower fees.  In particular, she points to three-year and five-year periods in which three actively managed funds (the Fidelity Freedom Funds, American Beacon Fund, and AllianzGI Fund) trailed related index funds in their rates of return.  In addition, she separately alleges that the plan's recordkeeping and management fees were excessive.

CommonSpirit moved to dismiss the complaint.  *See* Fed. R. Civ. P. 12(b)(6).  The district court granted the motion, concluding that Smith failed to allege facts from which it could plausibly infer that CommonSpirit acted imprudently in violation of ERISA.

## II.

## A.

Enacted in 1974, ERISA protects participants in employee benefit plans, including retirement plans, by establishing standards of conduct for plan fiduciaries.  29 U.S.C. § 1001(b). The law requires that a plan administrator discharge his duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  *Id.* § 1104(a)(1)(B).  The obligation includes "a continuing duty to monitor trust investments and remove imprudent ones."  *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015).  Trust law informs the duty of prudence, as "an ERISA fiduciary's duty is derived from the common law of trusts."  *Id.* at 528 (quotation omitted).  Bedrock trust principles establish that "[w]hether the trustee is prudent in the doing of an act depends upon the circumstances as they reasonably appear to him at the time when he does the act and not at some subsequent time when his conduct is called in question."  Restatement (Second) of Trusts § 174 cmt. b (Am. L. Inst. 1959); *see also Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 384–85 (6th Cir. 2015).

All of this requires "careful, context-sensitive scrutiny of a complaint's allegations" in order to "divide the plausible sheep from the meritless goats."  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  "Because the content of the duty of prudence turns on

'the circumstances . . . prevailing' at the time the fiduciary acts, the appropriate inquiry will necessarily be context specific." *Id.* (quoting 29 U.S.C. § 1104(a)(1)(B)). In the last analysis, "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022).

In gauging the sufficiency of a complaint, we take a well-worn trail. Civil Rule 8 requires that a plaintiff's complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). And Civil Rule 12 permits a district court to dismiss a complaint that fails "to state a claim upon which relief can be granted." *Id.* 12(b)(6). Taken together, the two rules require the plaintiff to provide sufficient "facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires the plaintiff to plead sufficient facts and law to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013).

Smith as an initial matter has not plausibly pleaded that this ERISA plan acted imprudently merely by offering actively managed funds in its mix of investment options. She alleges that "investors should be very skeptical of an actively managed fund's ability to consistently outperform its index" and that the Freedom Funds "chase[] returns by taking levels of risk that render [them] unsuitable for the average retirement investor." R.1 at 9. But such investments represent a common fixture of retirement plans, and there is nothing wrong with permitting employees to choose them in hopes of realizing above-average returns over the course of the long lifespan of a retirement account—sometimes through high-growth investment strategies, sometimes through highly defensive investment strategies. It is possible indeed that denying employees the option of actively managed funds, especially for those eager to undertake more or less risk, would itself be imprudent. Keep in mind that Smith could still choose an index fund investment for her 401(k), as CommonSpirit offered many such options. Offering actively

managed funds in addition to passively managed funds was merely a reasonable response to customer behavior. We know of no case that says a plan fiduciary violates its duty of prudence by offering actively managed funds to its employees as opposed to offering only passively managed funds. Several cases in truth suggest the opposite. *See Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 485 (8th Cir. 2020) (holding that "it is not imprudent for a fiduciary to provide both" actively and passively managed funds); *Davis v. Salesforce.com, Inc.*, No. 21-15867, 2022 WL 1055557, at *2 n.1 (9th Cir. Apr. 8, 2022) (affirming district court's dismissal of claim "that defendants breached the duty of prudence by failing to adequately consider passively managed mutual fund alternatives to the actively managed funds offered by the plan").

Even if CommonSpirit did not violate a fiduciary duty by offering actively managed plans in general, it is true, the company still could violate ERISA by imprudently offering *specific* actively managed funds. ERISA, in other words, does not allow fiduciaries merely to offer a broad range of options and call it a day. While plan participants retain the right to choose which fund is appropriate for them, the plan must ensure that all fund options remain prudent options. *See Tibble*, 575 U.S. at 529; *Hughes*, 142 S. Ct. at 742.

But Smith has not plausibly pleaded that the company violated this obligation either. She mainly compares the Fidelity Freedom Funds' performance to the Fidelity Freedom Index Funds' performance for a five-year period, noting that the Freedom Funds trailed the Index Funds by as much as 0.63 percentage points per year. The Freedom Index Funds, it is true, have the benefit of combining attractive features of active and passive management. They mix investment types, which actively managed funds do, but they do so with index fund versions for each type of investment, which keeps management fees low. But that does not make all other fund types imprudent. Just as there is still room for offerings of an index fund focused just on the S&P 500, so there is still room for offering an actively managed fund that costs more but may generate greater returns over the long haul. Nor does a showing of imprudence come down to simply pointing to a fund with better performance. We accept that pointing to an alternative course of action, say another fund the plan might have invested in, will often be necessary to show a fund acted imprudently (and to prove damages). But that factual allegation is not by itself sufficient. In addition, these claims require evidence that an investment was imprudent

from the moment the administrator selected it, that the investment became imprudent over time, or that the investment was otherwise clearly unsuitable for the goals of the fund based on ongoing performance.

Merely pointing to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for fifty years does not suffice to plausibly plead an imprudent decision—largely a process-based inquiry—that breaches a fiduciary duty. Precipitously selling a well-constructed portfolio in response to disappointing short-term losses, as it happens, is one of the surest ways to frustrate the long-term growth of a retirement plan. *See* Ellis, *supra*, at 83–87, 119. Any other rule would mean that every actively managed fund with below-average results over the most recent five-year period would create a plausible ERISA violation. Unless and until it becomes feasible to have all actively managed funds perform above average, that would lead to the disappearance of this option in ERISA plans.

Our reasoning also lines up with how one of our sister circuits has evaluated a similar claim. The Eighth Circuit rejected an employee's claim that plan administrators breached a fiduciary duty by offering actively managed stock and real estate funds in addition to passively managed ones, concluding it was "not imprudent for a fiduciary to provide both investment options." *Davis*, 960 F.3d at 485. That court explained that the two general investment options "have different aims, different risks, and different potential rewards that cater to different investors. Comparing apples and oranges is not a way to show that one is better or worse than the other." *Id.*; *see also Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged funds] were an imprudent choice at the outset.").

In resolving this case under Civil Rule 12(b)(6), it is worth noting parallels between this case and *Twombly*. There, a proposed class of telephone customers brought an antitrust action against regional telephone carriers, alleging that parallel conduct between established carriers to exclude new carriers and avoid intruding on each other's territory suggested "a contract, combination or conspiracy to prevent competitive entry." *Twombly*, 550 U.S. at 551. But the U.S. Supreme Court deemed that allegation insufficient. There was "an obvious alternative

explanation" that the companies were each following a "rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.* at 554, 567. Smith's performance-based allegations suffer from a similar defect. At most, they suggest the possibility of imprudent conduct—that parallel offerings performed differently over a few years. Just as comparison can be the thief of happiness in life, so it can be the thief of accuracy when it comes to two funds with separate goals and separate risk profiles. That is why disappointing performance by itself does not conclusively point towards deficient decision-making, especially when we account for "competing explanations" and other "common sense" aspects of long-term investments. *16630 Southfield Ltd. P'ship*, 727 F.3d at 504. In context, such allegations standing alone do not move the claim from possible and conceivable to plausible and cognizable. *Twombly*, 550 U.S. at 570.

Smith leans in, arguing that the Fidelity Index Funds are appropriate comparators to the Freedom Funds because they are sponsored by the same company, managed by the same team, and use a similar allocation of investment types. But, again, each fund has distinct goals and distinct strategies, making them inapt comparators. Nor is it clear that an after-the-fact performance gap between benchmark comparators by itself violates the process-driven duties imposed on ERISA fund managers. That a fund's underperformance, as compared to a "meaningful benchmark," may offer a building block for a claim of imprudence is one thing. *Meiners*, 898 F.3d at 822. But it is quite another to say that it suffices alone, especially if the different performance rates between the funds may be explained by a "different investment strategy." *Id.* at 822–23. A side-by-side comparison of how two funds performed in a narrow window of time, with no consideration of their distinct objectives, will not tell a fiduciary which is the more prudent long-term investment option. A retirement plan acts wisely, not imprudently, when it offers distinct funds to deal with different objectives for different investors.

One form of risk in the material world is not having money when you need it. The key word is "you." Each person has a distinct risk profile, making it prudent to offer a range of reasonable investment options, including passive and active funds. It's possible, indeed likely, that the absence of any actively managed funds suited for risk-tolerant investors would be imprudent.

Smith points out other ways in which CommonSpirit's decisions allegedly were imprudent, noting "red flags" that should have alerted the plan not to choose the Fidelity Freedom Funds. These include the discretion that fund managers had in choosing investments, net outflows from these funds to other investments, and outside analysts' critical evaluations of the funds. But when we view these facts in their proper foresight-over-hindsight perspective, they do not make a cognizable claim of imprudence. The capacity of the Freedom Funds' managers to change the Funds' asset allocation and deviate slightly from the Funds' glide path is merely a natural feature, not an unusual byproduct, of active management and well within the mainstream of industry practice. *See, e.g.*, BlackRock LifePath Dynamic Retirement Fund Series Prospectus 20, 151–52 (Apr.29, 2022), https://www.blackrock.com/us/individual/products/227864/blackrock-lifepath-retirement-portfoliocl-i-fund.

Even on its own comparative terms, the complaint does not measure up. Although investments in the actively managed Fidelity Freedom Funds decreased in recent years, they still remain more than twice as popular as the Freedom Index Funds as measured by their total amount of invested assets. Jason Kephart & Megan Pacholok, *2021 Target-Date Strategy Landscape*, Morningstar 8 (2021), https://www.morningstar.com/research/documents/1028662/2021-target-date-strategy-landscape. Morningstar gave the Freedom Funds and the Index Funds a "Silver" rating and rated the Freedom Funds' management team and process as "above average" or better. *Id.* at 10. Nothing in these reports suggests that the Freedom Funds' reputation was bad enough when viewed in the market as a whole that a prudent plan administrator should never have included them in the offerings or should have precipitously dumped them. We would need significantly more serious signs of distress to allow an imprudence claim to proceed. *See Griffin v. Flagstar Bancorp, Inc.*, 492 F. App'x 598, 604–05 (6th Cir. 2012) (finding plausible allegations of imprudence for an investment whose value fell from $14.95 to $0.68 per share and that analysts described as "a black hole").

Notably, the Fidelity Freedom Funds, as the district court pointed out, outperformed the Fidelity Index Funds in the most recent set of performance data, and the Freedom Fund suite

"remained significantly more popular than the Index Suite as late as 2018 and was the second-most popular target-date fund in the entire industry by market share." R.77 at 17–18. Given these realities, there were prudent reasons to offer the Freedom Funds, belying Smith's claim that "[p]lan participants should be shielded from the riskiest fund families where active manager decisions could amplify losses in periods of market decline." R.1 at 12. The district court fairly considered the more recent data because it was central to Smith's claim, publicly available, and judicially noticeable. *See Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999); *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014) ("[W]e have recognized that if a plaintiff references or quotes certain documents, or if public records refute a plaintiff's claim, a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment.").

Smith worries that the imperatives of pleading a process-based defect put her in a deep hole given the difficulty of gaining information about how her plan chose each investment. *See Meiners*, 898 F.3d at 822. Fair point. But it is Congress, not the courts, that established a cause of action premised on a duty of prudence, and at all events the difficulties are not insurmountable. ERISA's extensive disclosure requirements ease the burdens. Under the statute, a retirement plan must disclose a range of information about costs and performance, including the administrative expenses it charges to participants and investment-related information explaining the characteristics of the plan's investment options. 29 U.S.C. §§ 1023(b), 1108(b), 1365. Plus, publicly available performance information about an investment may show sufficiently dismal performance that this reality, when combined with "allegations about methods," will successfully allege that a prudent fiduciary would have acted differently. *Meiners*, 898 F.3d at 822.

Smith separately trains her sights on two other actively managed funds that CommonSpirit included in its 401(k) plan, the American Beacon Fund and the AllianzGI Fund. These funds too, she alleges, underperformed benchmark index funds consistently. But these shots also miss their mark for the same reason the first one does. It is "not imprudent to provide options with differing features from which to choose, regardless of whether some perform better

than others." *Davis*, 960 F.3d at 485. That CommonSpirit removed the AllianzGI Fund as an investment option in 2018 does not help Smith. It simply shows that CommonSpirit fulfilled its "continuing duty to monitor trust investments and remove imprudent ones." *Tibble*, 575 U.S. at 529.

B.

Smith also objects to the fees charged for administering CommonSpirit's 401(k) plan. CommonSpirit hired Fidelity to provide recordkeeping services for the entire plan, and it paid a flat annual fee of between $30 and $34 per person for this service. Smith alleges that this fee was too high, citing industry average costs of $35 per person for recordkeeping *and* administration for smaller plans. She also objects to the plan's investment management fees, which were around 0.55% of total assets annually.

As to the recordkeeping fees, Smith fails to give the kind of context that could move this claim from possibility to plausibility. She has not pleaded that the services that CommonSpirit's fee covers are equivalent to those provided by the plans comprising the average in the industry publication that she cites. Smith compares CommonSpirit's fees, for example, to some of the smallest plans on the market, which might offer fewer services and tools to plan participants. Smith has failed "to allege that the fees were excessive relative to the services rendered. [She] also allege[s] no facts concerning other factors relevant to determining whether a fee is excessive under the circumstances." *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (per curiam) (quotation omitted). Such pleaded facts do not suffice to create an inference that CommonSpirit was imprudent to choose recordkeeping fees of this amount.

As to the management fees, Smith's objection essentially replays her previous attack on CommonSpirit for offering actively managed funds. The plan offers a variety of investment options, with funds charging fees between 0.02% and 0.82% per year to invest an employee's contributions. The actively managed funds need to charge higher fees, because they must hire management teams to actively select investments to buy and sell, whereas index funds require less management and less upkeep. An average plan-wide management fee of 0.55% is merely evidence that CommonSpirit offers a number of actively managed funds, and an imprudence

claim based on this fee alone fails for the same reason that Smith's more general attack on active investments fails. Other appellate courts have also rejected challenges to ERISA plan management fees where it is clear those fees are set by market forces. *See Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009). "[N]othing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)." *Id.*

## C.

That leaves a few loose ends to tie. Smith claims in her reply brief that CommonSpirit acted disloyally in addition to imprudently by investing in Fidelity Freedom Funds. But that was too late to attempt to revive that dismissed claim. *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006). Even if Smith had not forfeited the claim, she failed to plead facts suggesting "the fiduciary's operative motive was to further its own interests," as required to show a breach of the fiduciary duty of loyalty. *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 40 (1st Cir. 2018) (quotation omitted).

Smith asks us to revisit the district court's denial of leave to amend her complaint. But her request to amend came in a form that we do not allow under Civil Rule 15, as a short footnote in her brief in opposition to CommonSpirit's motion to dismiss. "Indeed, a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought—does not constitute a motion within the contemplation of Rule 15(a)." *Beydoun v. Sessions*, 871 F.3d 459, 469 (6th Cir. 2017) (quotation omitted).

We affirm.